SMITH v. McCOURT ET AL., ASSIGNEES.

1. ASSIGNMENT FOR BENEFIT OF CREDITORS—JUDICIAL SUPERVISION.
For certain purposes, the supervision of insolvent estates is placed in the
  district courts.

2. SAME—LEAVE OF COURT TO FORECLOSE—DISCRETION.
While it may be true that proceedings to determine and enforce the
  liabilities of an insolvent estate should in all cases have the sanction
  of the proper court (a point not decided), yet where a creditor of
  an insolvent estate is plainly entitled to the remedy he seeks to
  enforce, as the foreclosure of a mortgage, a denial by the court of
  the privilege of resorting to such remedy is not the exercise of sound
  discretion.

3. RESCISSION.
In the absence of fraud, misrepresentation, concealment or mistake, a ·
  contract into which a party has deliberately and voluntarily entered
  will not be annulled on the ground merely that it was a hard bar-
  gain.

4. FINAL JUDGMENT.
An order which puts an end to a proceeding in the court in which it is
  . pending and is a judicial determination of the rights of the parties
  in so far as they are involved in that proceeding, is a final judg-
  ment, and reviewable as such upon error. The fact that such an
  order is made without prejudice to the right to renew the applica-
  tion does not make it any the less a final judgment.

*Error to the District Court of Arapahoe County.*

Mr. FRANK W. INGERSOLL, for plaintiff in error.

Messrs. RISING, BROWN & MALONE and Mr. JAMES H.
BROWN, for defendants in error.

THOMSON, J., delivered the opinion of the court.

On July 1, 1891, Horace A. W. Tabor executed to The
Northwestern Mutual Life Insurance Company his mortgage
deed, conveying to that company certain real estate in the
city of Denver to secure a loan from the company to him of
$400,000. On the 17th day of March, 1892, Tabor sold and

conveyed a portion of the mortgaged real estate to The Tabor Amusement Company, and the remainder to The Tabor Real Estate Company. On September 1, 1894, default was made by Tabor and the corporations to which he had conveyed in the performance of the agreements and covenants contained in the mortgage. On the 15th day of October, 1894, each of these corporations made a general assignment of its property for the benefit of its creditors to Peter McCourt and F. E. Edbrook, who thereupon duly qualified as assignees, and filed the schedules required by law in the district court of Arapahoe county.

On the 12th of September, 1892, The Tabor Amusement Company and The Tabor Real Estate Company executed a trust deed of all the real estate hereinbefore mentioned to Mitchell Benedict, trustee, to secure the payment of the promissory notes executed by them jointly to Horace W. Bennett and Julius A. Myers, one for $250,000, due in one year, and one for $25,000, due in six months, each with interest at 12 per cent per annum until maturity, and 24 per cent per annum after maturity, the interest payable monthly. Default was made in the payment of the $250,000 note; and the property was advertised for sale pursuant to the provisions of the trust deed. Proceedings were instituted by the corporations to prevent the sale, and a temporary injunction restraining it procured. While these proceedings were pending, at the solicitation of the two companies, to enable them to save their property, Laura D. Smith (then Laura D. Swickhimer) purchased from Bennett and Myers the unpaid note, and made an advancement of other moneys to the companies and thereupon the following instruments and note were executed.

" It is agreed that, by the terms of the within note for two two hundred and fifty thousand dollars ($250,000), dated March 24, 1893, made by The Tabor Amusement Company and The Tabor Real Estate Company to Horace W. Bennett and Julius A. Myers, there is now due and owing upon

said note and on account of advancements made under and by virtue of the terms of the trust deed securing payment of said note, the full sum of two hundred and seventy-one thousand and twenty dollars and thirteen cents ($271,020.13).

"It is also agreed that the time for the payment of said note is extended for a period of eighteen (18) months, on this 19th day of May, 1894, and two per cent of the interest, payable by the terms of said note is hereby waived.

"It is also agreed that as to all other terms, stipulations and agreements in said note contained or in the trust deed aforesaid set forth, they are to remain in full force and effect.

"It is further agreed that this is in no wise or manner to be considered a novation of contract.

"The Tabor Amusement Company,
                    "By H. A. W. Tabor, President.
"Attest: E. B. Tabor,
          "Secretary The Tabor Amusement Co.

"The Tabor Real Estate Company,
                    "By H. A. W. Tabor, President.
"Attest: E. B. Tabor,
          "Secretary The Tabor Real Estate Co.

"L. D. Swickhimer."

"In consideration of a loan by me this day made to The Tabor Real Estate Company and The Tabor Amusement Company, and the purchase by me of all the indebtedness of Bennett and Myers, secured by trust deed on the property of said companies to one Mitchell Benedict, I hereby agree that I will not declare any part of the indebtedness held by me, as aforesaid, to be due, provided the said companies will pay me two thousand dollars ($2000.00) per month interest on said notes for five months, and at the end of six months will pay me the whole of the six months' interest on said indebtedness, together with all interest accrued to said date and remaining unpaid; it being understood that this agreement becomes absolutely null and void and of no effect on and after the 19th day of November, 1894.

"(Signed)          L. D. Swickhimer."

" $74,000.00          DENVER, COLO., May 19, 1894.

" Eighteen months after date, without grace, for value received, we jointly and severally promise to pay to the order of L. D. Swickhimer, at Denver, Colo., the sum of seventy-four thousand dollars ($74,000), with interest at the rate of ten per cent per annum, from date until paid, interest payable monthly on the 19th day of each and every month.

     (Signed)         " THE TABOR REAL ESTATE CO.,

           (Seal)      " By H. A. W. TABOR, President.

                   " THE TABOR AMUSEMENT CO.,

           (Seal)      " By H. A. W. TABOR, President.

" Attest: E. B. TABOR,

     " Secretary for each Company."

Upon the execution of the foregoing instruments, Mrs. Smith (then Mrs. Swickhimer) was substituted for Bennett and Myers, as defendant in the injunction suit, and on the 21st day of May, 1894, the action was dismissed, and the injunction bond discharged and canceled.

After this transaction, the companies made default in the payment of the interest, of which, on the 19th day of October, 1894, $10,000 had accrued, and only $4,000 had been paid, leaving an unpaid residue of $6,000, of which the sum of $4,713 was due upon the Bennett and Myers note, and $1,287 on the $74,000 note; whereupon she notified each of them that by reason of the default she had elected to declare all of the indebtedness due and payable. Both companies were insolvent.

On the 17th day of November, 1894, Mrs. Smith applied to the district court for leave to foreclose her trust deed, and about the same time The Northwestern Mutual Life Insurance Company made application to the same court for leave to foreclose its mortgage. Mrs. Smith, in her petition, set forth the facts as we have given them. The assignees joined in a voluminous plea, which they styled a " petition," but which was in effect only an answer to the two petitions for leave to foreclose. The material allegations of the petition

of Mrs. Smith were not denied, and the only statements in the plea, which we deem of importance for any purpose of this decision, are the following:

"That the indebtedness of said petitioner, L. D. Smith, does not by its terms in the passage of time, mature and become payable until eighteen (18) months after May 19, 1894, to-wit, the 19th day of November, A. D. 1895; that as appears by the file of this honorable court in case No. 2,588, in division No. 1, the said, The Tabor Real Estate Company and said Tabor Amusement Company, prior to the making of said assignment to your petitioners, filed a bill in equity against the said petitioner, L. D. Smith and others as will more particularly appear by the files in said cause, to which reference is hereby expressly made, for further description and greater certainty, as a part and parcel of this petition, wherein and whereby a rescission of the transactions covering the indebtedness of said petitioner, L. D. Smith, described in her said petition, is sought to be had, as well as an accounting and a deduction from the amount of said indebtedness as claimed by said petitioner, L. D. Smith, in her said petition, to an amount of between forty thousand (40,000) and fifty thousand (50,000) dollars."

The complaint for rescission referred to in the foregoing is set forth in full in the transcript, and alleges the following as the grounds of their right to relief:

"That for some time prior to on or about the 19th day of May, A. D. 1894, as plaintiffs believe and so allege, said defendant Swickhimer (now Smith) was the owner of one thousand ten (1,010) shares of the par value of one hundred (100) dollars per share of the capital stock of that certain bank then and there created, organized, existing and doing business as a banking corporation under the acts of the congress of the United States providing for the incorporation and existence of national banks, known as and called The City National Bank of Denver, Colorado.

"That in the month of May, A. D. 1894, and for some months prior thereto, the said bank stock was not of the rea-

sonable market value of more than about par, and the said
one thousand and ten (1,010) shares of stock owned by said
defendant Swickhimer (now Smith) in said bank was only
worth at the then reasonable market value, the sum of about
one hundred and one thousand ($101,000) dollars; that the
said defendant Swickhimer (now Smith) was fully advised,
and then and there thoroughly familiar with the character
and value of the assets of the said bank, and that the said
stock thereof so owned by her was not of the reasonable
market value of more than about the said sum of one hun-
dred and one thousand dollars ($101,000).

" That the said defendant, Swickhimer (now Smith) know-
ing of the embarrassed and distressing financial condition
and situation of the said plaintiff companies with respect to
their said real estate, and as plaintiffs are informed and be-
lieve and so charge the fact to be, believing that she could
drive a bargain with the said plaintiff companies, whereby
she could dispose of her said bank stock at an amount grossly
in excess of what it was then reasonably worth, and thereby
save herself from sustaining any real or imagined loss on the
purchase price and original cost or estimated value to her of
the said bank stock when she first became the owner of the
same, procured and caused negotiations to be commenced
with her and her said agents pending the hearing of said
injunction suit against the foreclosure of said trust deed on
said real estate by said Mitchell Benedict, trustee, therein
and defendant herein.

" Plaintiffs further allege that said negotiations covered a
period of several weeks, and that there were several continu-
ances of the said hearing granted pending the same, and to
enable the parties thereto to arrive at a basis for negotiation.;
that as the said negotiations in point of time were prolonged,
the said defendant, Swickhimer (now Smith), fully perceiv-
ing the embarrassed and helpless condition of the said plain-
tiffs with respect to preventing a sacrifice of their said prop-
erty, kept increasing and enlarging her demands until as the
time of the last continuance of the said injunction case was

about to expire, the said plaintiff companies, in order to prevent and, if possible, avoid the ruinous sacrifice which must result to them from the foreclosure of their said trust deed, and the loss of their said equity of nine hundred thousand dollars ($900,000) therein, were compelled against their own free will and voluntary consent to submit wholly and absolutely to the terms and conditions dictated by the avarice and desire for gain of the said defendant, Swickhimer (now Smith).

"That the said defendant, Swickhimer (now Smith), prepared resolutions and papers and documents which the stockholders and directors and officers of said plaintiff companies were compelled against their voluntary will and consent, as aforesaid, to execute, wherein and whereby it was, among other things, recited that the total sum of money to be used by the said Swickhimer (now Smith) in the purchase of said claims of said Bennett and Myers and in the advances to said companies to liquidate their said indebtedness to the said The Northwestern Life Insurance Company for interest, as aforesaid, and other amounts to the amount of not exceeding about _____ dollars, amounted to the sum of three hundred and forty-five thousand dollars (345,000).

"That by a memorandum agreement dated May 19, 1894, the full sum of two hundred and seventy one thousand and twenty dollars and thirteen cents ($271,020.13) was fixed as at that date due and owing upon said note and on account of advancements made under and by virtue of the terms of the trust deed securing the payment of said note of two hundred and fifty thousand dollars ($250,000) payable to said Bennett and Myers, and the time of payment thereof of said note extended for the period of eighteen (18) months from May 19, 1894, with interest payable at the same rate waiving a claim of two (2) per cent per month after maturity.

"That the value of said one thousand and ten (1,010) shares of bank stock was fixed at the rate of one hundred and ninety dollars ($190.00) per share in cash, but that the said Bennett and Myers would not agree to accept said bank stock as part payment in the purchase of the said two hundred and

fifty thousand dollars ($250,000) note for more than the gross sum of one hundred and fifty thousand dollars ($150,000) and that said plaintiff companies must make up to said defendant, Swickhimer (now Smith), an alleged loss to her upon the alleged value of said bank stock so valued by her at the rate of one hundred and ninety dollars ($190.00) per share, the aggregate sum of forty one thousand nine hundred dollars ($41,900.00).

" Plaintiffs allege that in truth and in fact that neither of them received any consideration whatsoever, legal or equitable, directly or indirectly, for or on account of said alleged loss of value of said bank stock to the amount of said forty one thousand nine hundred (41,900.00) dollars."

At the hearing, the court allowed the application of the Insurance Company, but denied that of Mrs. Smith, and she has brought her case here by writ of error.

Upon a careful examination of the record, we are unable to discover any reason for the ruling in the Insurance Company's case that does not apply with equal force to the case of this petitioner. Although for certain purposes the law has placed the supervision of insolvent estates in the district court, there may be some question whether in this case the petitioner might not have proceeded to the foreclosure of her mortgage according to its terms without any application to the court for leave ; but the application, as made, was perhaps not improper, and as both sides seemed to concede the authority of the court in the premises, we shall assume, for the purposes of this decision, that the court had jurisdiction to make the order. But while it may be true that proceedings to determine and enforce the liabilities of an insolvent estate should in all cases have the sanction of the proper court, it was not the intention of the law to clothe the court with power to embarrass creditors needlessly in the assertion of their rights ; and where a creditor is plainly entitled to the remedy which he seeks, the placing of an obstruction in his way, by denying him the privilege of resorting to his remedy, is not the exercise of a sound discretion. This petitioner's

right of action had accrued when she filed her petition. The indebtedness secured by the trustee to Benedict had matured before she became its owner. Upon her purchase of the indebtedness she entered into an independent arrangement with the Amusement and Real Estate Companies, whereby, subject to certain conditions, its maturity was postponed for the period of eighteen months from the 19th day of May, 1894. One of the instruments provided in terms for the extension of the time of payment of the Bennett and Myers note for eighteen months; the other related to the old debt and the new loan, and covered a period of six months. They were both executed at the same time, as parts of the same transaction, and may be considered together as one contract. This contract expressly provided that, except as to the time when the note should become due, and except as to a portion of the interest payable, all the terms, stipulations and agreements contained in the note, or in the trust deed, should remain in full force and effect. By the express terms of the note the interest was payable monthly, and by the express terms of the trust deed, upon default in the payment of any installment of interest when it should become due, the whole of the principal sum secured might, at the option of the holder of the note, become due and payable, and the trust deed be foreclosed in the same manner and with the same effect as if the principal indebtedness itself had matured. The agreement to postpone the maturity of the note until November 19, 1895, gave to the note an effect precisely the same as if it had been originally made payable at that time; but the stipulation in the trust deed concerning the rights of the holder in the event of a default in the payment of the interest when due remained in force; and in such event it was optional with the holder to declare the entire amount due, and proceed accordingly. The stipulation of the petitioner not to declare any part of the indebtedness held by her to be due, provided the interest on both notes should be paid as expressed in her agreement, was in force for six months, and was supplemental to, and not incon-

sistent with, the agreement for the extension of the Bennett and Myers note. The companies made default in the payment of interest very soon after the contract with a petitioner was made, and at the end of five months were seriously in arrears upon both notes. She exercised the option provided for in the trust deed to Benedict, and notified the companies that by reason of their default the note for two hundred and fifty thousand dollars to Bennett and Myers was due and payable.

It thus appears upon the face of the record that the time the petitioner made her application for leave to proceed upon the trust deed, the indebtedness which it secured was due, and the court was not authorized to deny her the right to employ the means provided by law or by the deed for the collection of her debt, unless some facts were made to appear by reason of which it would be inequitable to permit her to assert her rights. The only allegation in the pleading filed by the assignees which may be said to tend in this direction is that a proceeding was then pending, instituted by the two companies against the petitioner, to obtain an annulment of the contract with her. If the bill for rescission was sufficient upon its face to support a decree in favor of the complainants, and if a cancellation of the contract of May 19, 1894, could affect adversely any right or remedy of the petitioner in relation to the Bennett and Myers note, or the trust deed securing it, it might be that it would be the duty of the court to withhold permission for the foreclosure of the trust deed until the questions involved in that proceeding should be determined; but as to this we do not deem it necessary to express an opinion.

The petition in this case is for leave to foreclose the trust deed given to Benedict, as trustee for Bennett and Myers, on the 4th day of March, 1893, and which, together with the note which it secured, had become the property of the petitioner by purchase from Bennett and Myers. The contract sought to be rescinded was made on the 19th day of May, 1894, and was confined to an extension of the time of payment of the

Bennett and Myers indebtedness, for a specified period, and subject to certain conditions, in consideration of a new transaction between the petitioner and the Amusement and Real Estate Companies, in pursuance of which she advanced them additional moneys, and received their note for seventy-four thousand dollars ($74,000). The utmost possible effect of a rescission of that contract would be to cancel this seventy-four thousand dollar ($74,000) note, and annul the conditions upon which the extension of time of payment of the Bennett and Myers note was granted. Whether the seventy-four thousand dollar ($74,000) note was also secured upon the property of the companies, the petition does not inform us, although it may be inferred from the language of a notice served upon the companies by the petitioner that it was. If so, a rescission would operate to avoid that security ; but the Bennett and Myers trust deed would be untouched by any decree which the court could render in the case, except that the restraint upon its immediate foreclosure, which was imposed upon the petitioner by her contract, would be removed. Therefore, whether the contract was voidable or not, the Bennett and Myers note was due and payable, and the pendency of the suit for the annulment of the contract furnished no reason for a denial of her right to institute proceedings for its collection.

We may say, however, in relation to the suit for rescission, that the matters set forth in the complaint are not sufficient to authorize the granting of the relief prayed. No fraud, misrepresentation, concealment or mistake is alleged, nor any fact of any nature which would give a court of equity jurisdiction to interfere in behalf of the complainants, to protect them against the consequences of a transaction into which they deliberately and voluntarily entered. If their necessities were such that they were forced to accept terms which otherwise they would have refused, the situation was unfortunate for them, but their financial condition alone, however desperate it may have been, cannot be made the foundation of a claim to equitable relief against obligations which by reason

of their condition they thought themselves compelled to assume.

It is objected that the order of denying the application of the petitioner was not a final judgment, and hence cannot be the subject of review in this court. Orders entered in a cause at the instance of either party before it is finally determined are interlocutory; but an order which puts an end to a proceeding in the court in which it was pending, and is a judicial determination of the rights of the parties in so far as they are involved in that proceeding, is a final judgment. The term "final judgment," as decided in *Martin v. Simpkins,* 20 Colo. 438, includes "orders and decisions in special proceedings, as well as judgments in ordinary civil and criminal actions, provided such orders or decisions be made by the court in a proceeding instituted and pending before the court." See, also, *Dusing v. Nelson,* 7 Colo. 184; *Henry v. Travelers' Ins. Co.,* 16 Colo. 179; *Hagerman v. Moore,* 2 Colo. App. 83.

In *Henry v. Travelers' Ins. Co.,* it was decided that an order denying the application of the plaintiff in error to intervene in an action pending between other parties, and in the subject-matter of which he claimed an interest, was a final judgment to which a writ of error would lie; the court saying: "Upon the entry of the judgment or order denying Henry's application to intervene, the cause was finally determined as to him; and unless he be entitled to a writ of error from this court, he is precluded from any review of such judgment." In the case at bar the petitioner instituted a special proceeding to obtain the permission of the court to foreclose her trust deed, and the judgment denying her application was a final determination of that proceeding. As long as it remains in force it is a complete bar to any proceeding, of any nature, which she might institute for the foreclosure of her mortgage, and unless it can be reviewed in this court there will be a failure of justice.

The order was made without prejudice to the right of the petitioner to renew her application; and hence, also, say coun-

sel, the order was not final. Again we must disagree with counsel. The application could be renewed only in a new proceeding. The original proceeding was at an end. The order was a final disposition of that proceeding. It frequently occurs that a bill in equity is dismissed without prejudice to the institution of a new suit; but the judgment is not therefore any the less final, or the complainant's right to have it reviewed on appeal in any degree impaired. We have no doubt that the order in this case is reviewable here, and entertaining, as we do, the opinion that it was arbitrary and unwarranted, we cannot do otherwise than reverse it. The order of judgment is therefore reversed and remanded, with instruction to the district court to enter an order granting the petitioner leave to foreclose her trust deed as she may be advised.

*Reversed.*